ANGLE v. BANKERS' SURETY CO.

(District Court, N. D. New York. November 17, 1913.)

1. INDEMNITY (§ 12*) — DISCHARGE OF INDEMNITOR OF SURETY — RELEASE OF SURETY.

A contractor for the doing of certain work on the New York State Barge Canal sublet a portion of the work taking a bond for its performance by the subcontractor signed by a surety company. The subcontractor again sublet to a construction company taking a bond from it signed by the same surety company. Bankrupt, who was an officer and stockholder of the construction company, executed a bond to the surety company to indemnify it against loss on the latter bond and later secured the same with other obligations by a mortgage on his own property. Later, by an agreement between them to which bankrupt was not a party, the first subcontractor released the surety company from liability on the bond given him by the construction company. Held, that the effect was to discharge bankrupt from liability on the indemnity bond and also to discharge the mortgage in so far as it secured such liability.

[Ed. Note.—For other cases, see Indemnity, Cent. Dig. §§ 26, 27; Dec. Dig. § 12.*]

2. BANKRUPTCY (§ 178*) — PREFERENCE — MORTGAGE TO SECURE ADVANCES TO CORPORATION.

Bankrupt, who was an officer and stockholder of a construction company engaged in the performance of contracts which it did not have sufficient money to complete, within four months prior to his bankruptcy executed a mortgage to a surety company which was surety on the bonds given for performance of the contracts to secure money to be advanced by the surety company as needed to carry on the work, and the money was so advanced and used. Bankrupt was also indorser on the paper of the construction company, had indemnified the surety company against loss on account of its suretyship, and was vitally interested in the completion of the contracts. Held, that the mortgage was not a fraud on creditors nor a preference, but was based on a present consideration and was valid and enforceable.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 221, 264–274, 283, 284; Dec. Dig. § 178.*

For other definitions, see Words and Phrases, vol. 6, pp. 5498, 5499; vol. 8, p. 7759.]

In Equity. Suit by Edwin C. Angle, as trustee in bankruptcy of Edward F. Garling, against the Bankers' Surety Company. Decree for complainant for partial relief.

Suit in equity to set aside a mortgage on real estate executed and delivered by Edward F. Garling and wife to the Bankers' Surety Company on the 2d day of August, 1910, and recorded October 12, 1910, and given to secure the payment of the sum of $13,000 to be advanced by the Bankers' Surety Company to the Mohawk Engineering & Construction Company and also to indemnify the said Bankers' Surety Company against loss by reason of its being surety on two bonds of said corporation conditional for the completion and performance of two contracts for construction work.

Daniel Naylon, Jr., and John D. Miller, both of Schenectady, N. Y., for complainant.

Joseph A. Murphy, of Albany, N. Y., for defendant.

RAY, District Judge. The mortgage sought to be set aside is dated August 2, 1910, and is executed by Edward F. Garling and Ella E.

Garling, his wife, and also by the Bankers' Surety Company in the form of an agreement. It recites: (1) The letting to the American Pipe & Construction Company contracts No. 20-C and No. 20-D for the building and construction of sections 2 and 3 of the New York State Barge Canal. (2) The assignment and subletting of certain of such work to Harry J. Warner of Albany, N. Y. (3) The assignment and subletting by said Warner of the work to be done by him to the Mohawk Engineering & Construction Company. (4) That said Mohawk Company (so called for brevity) was to give a bond to be executed by a surety company for the faithful performance of the work to be done by it in conformity to the said contracts, No. 20-C and No. 20-D. (5) That the said Mohawk Company did give a bond with the Bankers' Surety Company, this defendant, as surety. Also: (6) That in April, 1910, the trustees of the Village of Matteawan, N. Y., let to the said Mohawk Company a contract for certain grading and paving in said village. (7) That said Mohawk Company was to give a bond to said village for the faithful performance of its contract. (8) That it did give such a bond with said Bankers' Surety Company as surety thereon. Also: (9) That said Bankers' Surety Company, as a condition of executing such bonds, required the said Mohawk Company to give it a bond of indemnity. (10) That Edward F. Garling (the mortgagor) became such indemnitor for said Mohawk Company. (11) That the Mohawk Company is temporarily in need of money for prosecuting the work of both of said contracts. (12) That the Bankers' Surety Company is willing to furnish such money to said Mohawk Company in a sum not exceeding $13,000, to be used in the prosecution of such work and the performance of such contracts. Such mortgage then states that Garling and wife, parties of the first part, in consideration of one dollar "and the sum of $13,000, which said sum is to be held for the use and benefit of the Mohawk Engineering & Construction Company and to be paid by the party of the second part to the said Mohawk Engineering & Construction Company upon weekly estimates of the work done upon the two contracts hereinbefore referred to, the said weekly estimates to be made and furnished by one John J. Ryan of Albany, N. Y., do hereby grant and convey unto the said party of the second part (said Bankers' Surety Company) its successors and assigns," all, etc. (Here follows a description of the mortgaged property.)

Then came the following conditions and agreements:

"And the said party of the second part in consideration of the conveyance and conveying of the above described property to it does hereby agree to furnish and provide for the use and benefit of the Mohawk Engineering & Construction Company the sum of thirteen thousand dollars ($13,000.00) to be used in the performance of the work of the said two contracts hereinbefore referred to the said sum to be paid by the said party of the second part to the Mohawk Engineering & Construction Company upon weekly estimates of the work done upon the two said contracts and the said weekly estimates to be made and furnished by one John J. Ryan of Albany, N. Y.

"It is hereby mutually agreed and understood that the party of the first part after the expiration of ninety days from the completion of the two contracts hereinbefore referred to shall be entitled to and shall have a reconveyance of the property hereinbefore described and conveyed from the party of the second part, its successors and assigns upon his showing to the satisfac-

tion of the said party of the second part, its successors and assigns that the said contracts have in all things been fully, properly and faithfully performed and completed and upon the said party of the first part paying to the said party of the second part, its successors or assigns the sum of thirteen thousand dollars ($13,000.00) with interest thereon at the rate of 6 per cent. per annum, and upon his likewise paying to the party of the second part such costs and expenses as it may have incurred in inspections made of and upon the work of said contracts and attorneys' fees in the matter of this agreement and its preparation.

"It is further mutually expressly understood and agreed that should a loss be sustained in the performance of the work of either or both of said contracts which the said party of the second part might as a surety on the bond of the Mohawk Engineering & Construction Company be liable to pay that then and in that event the said party of the first part shall not be entitled to a reconveyance of the property hereinbefore described and conveyed until said loss shall have been adjusted, satisfied and fully paid and further that said party of the first part shall not be entitled to a re-conveyance of the said property hereinbefore described and conveyed until any liability that the party of the second part may have incurred as a surety on the bond of the Mohawk Engineering & Construction Company shall have been adjusted, settled and fully paid to the amount of the value of the property hereinbefore described and conveyed and that said property is not only liable, responsible and answerable to the party of the second part for the sum of thirteen thousand dollars ($13,000.00) and interest and costs and expenses hereinbefore mentioned but likewise for any loss, liability, damage or expenses that the said party of the second part may sustain or incur as a surety on the bonds of the said Mohawk Engineering & Construction Company.

"It is further expressly mutually agreed and understood that the liability of the said Edward F. Garling, the party of the first part hereto is not by the execution of this agreement in any way limited, modified or changed as an indemnitor on the bonds of the Mohawk Engineering & Construction Company upon which said bonds the party of the second part hereto is a surety."

It appears on the face of this instrument, assuming the recitals to be correct, that Garling, the mortgagor, had already assumed a liability, contingent, of course, as indemnitor for the said Mohawk Company, which company was to perform the contracts referred to, and that he, in and by said mortgage, pledged the mortgaged property to the Bankers' Surety Company as security for the repayment of the sum of $13,000 to be thereafter advanced by said surety company to or for the Mohawk Company, and which money was to be used in the prosecution of such work; that is, the work called for by the contracts.

April 12, 1910, H. W. Sylvester and Edward F. Garling had signed a bond to the Bankers' Surety Company in the sum of $15,000, reciting that:

"Whereas the said Bankers' Surety Company has become or is about to become surety at the request of the said Mohawk Engineering & Construction Company on a certain bond in the sum of $15,000, wherein Mohawk Engineering & Construction Company is principal, conditioned for the construction of the paving of the main street of the village of Matteawan, now the condition" etc.—which was that Sylvester and Garling would save harmless said Bankers' Surety Company by reason of its becoming surety for the Mohawk Company.

On this bond was written and signed by Garling the following:

"I am worth in personal and real estate clear of debt above the sum of fifteen thousand dollars.                    Edward F. Garling."

May 23, 1910, said Sylvester and Edward F. Garling had signed a like bond in the sum of $15,000 to said surety company to save it harmless, etc., for having signed the bond of the Mohawk Company for the construction of certain Barge Canal work, recited as "the construction of Barge Canal contract supplementary to contract No. 20-C and No. 20-D."

May 16, 1910, the Mohawk Company with the Bankers' Surety Company gave a bond to Harry J. Warner in the sum of $13,000 to perform the work, etc., on the Barge Canal, contracts No. 20-C and No. 20-D, in accordance with the terms of the contract between the Mohawk Company and Harry J. Warner.

October 18, 1910, Warner released and canceled this bond as follows:

"I, the undersigned, hereby release, cancel and surrender this bond to the Bankers' Surety Company in consideration of an agreement executed concurrently herewith by and between the Bankers' Surety Co. and myself. .
"Dated Albany, N. Y., Oct. 18, 1910.        Harry J. Warner."

The agreement referred to reads as follows:

"This agreement, made between the Bankers' Surety Company of Cleveland, Ohio, party of the first part, and Harry J. Warner of Albany, N. Y., party of the second part, Witnesseth that:

"Whereas, the first party did heretofore issue a bond in the penalty of thirteen thousand dollars ($13,000.00), to the second party, conditioned for faithful performance of a contract entered into between the said second party and the Mohawk Engineering & Construction Company; and

"Whereas, the said Mohawk Engineering & Construction Company has defaulted in the performance of the terms of said contract and abandoned same; and

"Whereas, the said first party did issue a bond in the penal sum of twenty thousand dollars ($20,000.00), to the American Pipe & Construction Company, for the faithful performance of the work set forth and covered by a contract between the said second party and the said American Pipe & Construction Company, which latter contract is dated the 7th day of May, 1910, and the second party is totally unable to carry out the terms of said contract so entered into by him, with said American Pipe & Construction Company, and desires to be relieved of any liability on the bond so given, and of all liability of every kind and nature arising or growing out of the execution by him, of either or both said bonds, to the first party.

"Now witnesseth: That the said second party hereby surrenders to the first party, said bond in the sum of thirteen thousand dollars ($13,000.00), issued to him by the Bankers' Surety Company, for cancellation and surrender waiving any and all rights which said second party secured thereunder, by reason of default of the said Mohawk Engineering & Construction Company; and the first party in consideration thereof, hereby agrees to release and discharge, and hold harmless the second party as principal or otherwise, of and from all liability arising or that may hereafter arise, under and by virtue, of a bond in the sum of twenty thousand dollars ($20,000.00), executed by the second party as principal to the American Pipe & Construction Company, on or about May 23, 1910.

"In witness whereof, the parties have hereunto set their hands and seals, this 18th day of October, one thousand nine hundred and ten.
                    "The Bankers' Surety Company, by
                        "Harry B. Sprague, Assistant Secretary.   [L. S.]
                    "Harry J. Warner.                              [L. S.]"

May 23, 1910, the Mohawk Company, by said Sylvester, its president and said Garling, its treasurer, applied to the Bankers' Surety

Company for a bond in the sum of $13,000 to be given to Harry J. Warner for the "construction of creek entrances," etc. May 25, 1910, Harry J. Warner applied to the said surety company for a bond in the sum of $20,000 to be given to the American Pipe & Construction Company for "employment contract connected with the construction of Barge Canal, contract No. 20-C and No. 20-D." At same time the Mohawk Company applied to the Bankers' Surety Company for a bond in the sum of $15,000 to the village of Matteawan for paving. November 29, 1910, said Edward F. Garling was duly adjudicated a bankrupt on a petition filed that day, and Edwin C. Angle was duly appointed trustee of his estate and duly qualified as such.

August 5, 1910, it was resolved by the board of directors of said Mohawk Company that John J. Ryan of Albany, N. Y., be appointed attorney in fact for said company for the purpose of collecting and receiving the said $13,000 to be advanced by said Bankers' Surety Company under said mortgage agreement and applying said money in and towards the prosecution and carrying on of said paving work in Matteawan and in building and constructing the work of part of sections 2 and 3 of the said Barge Canal, and also for the purpose of receiving for and on behalf of the Mohawk Company all money due or to grow due upon either or both of said contracts for work done in execution of the Matteawan contract or in execution of contracts on sections 20-C and 20-D of the Barge Canal. Sylvester, as president of the Mohawk Company, was authorized and directed to execute the power of attorney.

The Bankers' Surety Company by check paid to said John J. Ryan, attorney in fact, as follows:

| | |
|---|---:|
| August 4, 1910 | $ 3,000 00 |
| August 12, 1910 | 4,000 00 |
| August 31, 1910 | 2,000 00 |
| September 7, 1910 | 2,500 00 |
| September 16, 1910 | 1,500 00 |
| Total | $13,000 00 |

John J. Ryan, attorney in fact, paid to Sylvester, president, by check as follows:

| | |
|---|---:|
| August 6, 1910 | $2,500 00 |
| August 6, 1910 | 500 00 |
| September 17, 1910 | 1,200 00 |
| September 17, 1910 (to Sylvester personally) | 50 00 |

And to E. F. Garling treasurer by check as follows:

| | |
|---|---:|
| August 26, 1910 | $3,167 19 |
| August 26, 1910 | 600 00 |
| August 26, 1910 | 252 26 |
| September 10, 1910 | 3,077 12 |
| September 10, 1910 | 75 00 |

And also as follows:

| | |
|---|---:|
| August 13, 1910, H. W. Jackson | $2,761 36 |
| August 13, 1910, H. W. Jackson | 200 00 |
| August 13, 1910, Wm. S. Ver Planck | 145 00 |
| August 13, 1910, D. P. Bruk Co. | 7 20 |

| | |
|---|---:|
| August 13, 1910, H. L. Bond Co.............................. | $ 694 85 |
| August 13, 1910, O. A. Kappel Co............................ | 250 00 |
| August 20, 1910, L. J. Dooley.............................. | 500 00 |
| August 23, 1910, Rose & Kiernan........................... | 1,024 28 |
| August 23, 1910, P. V. Baird.............................. | 50 00 |
| August 24, 1910, D. S. Gardenier.......................... | 109 62 |
| August 29, 1910, D. S. Gardenier.......................... | 50 00 |
| September 1, 1910, L. Hardware Co......................... | 104 49 |
| September 2, 1910, Rose & Kiernan......................... | 252 26 |
| September 3, 1910, Rose & Kiernan......................... | 3 90 |
| September 3, 1910, D. S. Gardenier........................ | 109 07 |
| September 3, 1910, D. S. Gardenier........................ | 50 00 |
| September 6, 1910, D. S. Gardenier........................ | 121 36 |
| September 6, 1910, P. P. Lent............................. | 200 00 |
| September 7, 1910, H. D. Schutt........................... | 50 00 |
| September 13, 1910, E. O. Brien........................... | 337 40 |
| September 13, 1910, Rose & Kiernan........................ | 25 00 |
| September 19, 1910, P. V. Baird........................... | 35 00 |
| October 5, 1910, Rose & Kiernan........................... | 1 35 |
| October 5, 1910, Rose & Kiernan........................... | 76 00 |
| October 9, 1910, Cash.................................... | 10 00 |
| October 12, 1910, P. B. Paul............................. | 2,043 00 |
| October 11, 1910, P. B. Paul............................. | 457 00 |
| October 17, 1910, Mrs. J. W. Whalen....................... | 21 50 |
| October 17, 1910, Sewell & Alden.......................... | 20 00 |

November 10, 1910, an involuntary petition in bankruptcy was filed against said Mohawk Engineering & Construction Company, and January 28, 1911, it was duly adjudicated a bankrupt accordingly. August 2, 1910, Garling was not only a stockholder in the Mohawk Company, but its treasurer, as stated.

At the time the mortgage was given it appears that the Mohawk Company had proceeded with the work on the Matteawan contract and on the Barge Canal contract (known as the Tribes Hill Job) so long as their money lasted, and that they then went to the bonding company and made arrangements for a loan. Garling says:

"Q. What was done to make arrangements for the loan? A. We arrived at the amount of $13,000 by my giving a bond and mortgage. Q. And that is the mortgage that has been introduced in evidence here dated August 2, 1910? A. Yes."

At that time Garling had the following property: State street property; Center street property; Helderberg avenue property; 3 life insurance policies; 5 Mohawk Brewing Company bonds; 25 shares of stock in the brewing company; 30 shares of stock in this Mohawk Company; also in cash $3,400.

He was then owing:

| | |
|---|---:|
| Mohawk National Bank..................................... | $11,000 00 |
| Schenectady Trust Company................................ | 7,500 00 |
| Wagon Watson Company.................................... | 1,900 00 |
| Herald Bond Company..................................... | 300 00 |
| Other creditors about.................................... | 1,800 00 |

At that time there was no market for the stock of the Mohawk Company or the bonds of the Mohawk Brewing Company. The Mohawk Company was then engaged in doing the work on three contracts; Matteawan commenced in May, 1910; the Barge Canal (Tribes Hill); and a paving contract at St. Johnsville. It was then a going concern.

Garling puts the value of his Center street property at $50,000.

June 2, 1910, Mr. Garling made a statement of his assets and liabilities to the Bankers' Surety Company in which he placed the value of his real estate at $82,000, subject to a mortgage of $3,000; that of his stocks and bonds at $7,500; with cash in bank about $6,000. He says he based real estate values on rents received, not market values.

The claims proved against Garling in the bankruptcy proceedings are $22,239.41. The claims proved against the Mohawk Company are $26,833.28.

The money received by Ryan and paid as attorney in fact over and above the $13,000 came from the Matteawan contract; nothing from the Tribes Hill contract. One P. B. Paul, employed by the Bankers' Surety Company, completed the Matteawan contract, and on this there was a small profit. After putting in a cofferdam on the Tribes Hill contract at an expense of some $75,000, it was washed out, and that contract was abandoned.

The plaintiff has given proof showing that August 2, 1910, the property of Garling was actually worth $32,150, and that his liabilities aside from his contingent liabilities by reason of having become indemnitor for the Mohawk Company were $17,382. Adding the contingent liabilities on the Matteawan contract $15,000, which never became fixed, and that on the Barge Canal contracts $15,000, and his total liabilities were $47,382. The mortgaged property was worth $23,250, at least leaving other property of the value of $7,900, or about.

In short, on the 2d day of August, 1910, Garling in order to secure a loan to the Mohawk Engineering & Construction Company of which he was treasurer and in which he was a stockholder and for which he had become indemnitor, to enable it to prosecute the work on the contracts which it had undertaken to do, mortgaged certain of his real estate to secure such loan to the Bankers' Surety Company, which, of course, knew of Garling's liability to it as indemnitor for the bonds it had given for the faithful and complete performance of the work. This was within four months of Garling's bankruptcy. But Garling and the Bankers' Surety Company went further than this, for the mortgage secured, so far as it would go, the Bankers' Surety Company against its liability and possible loss by reason of having become surety on the bonds mentioned, and hence incidentally Garling gave the mortgage as security for his own liability as indemnitor to the Bankers' Surety Company. That is, by making the loan of $13,000 to the Mohawk Company, and obtaining the agreement by which the money was to be devoted to the work for the performance of which the surety company had given its bond, it secured the performance of so much of the work, obtained security for the repayment of the money thus lessening its own liability, and at the same time obtained security by way of mortgage from Garling for his liability as indemnitor. This was the effect of the transaction. If the transaction was intended as a fraud on the other creditors of Garling within the meaning of the law, it could be set aside; but it was based on a valid consideration, and I do not see that it was intended by any one to cheat or defraud any one. Was the transaction a preference in the eye of the bankruptcy act? The Bankers' Surety Company knew that the work to be done under

the contracts which the Mohawk Company was to perform had come substantially to a standstill and that it must have financial aid or it would become bankrupt. I think it knew the Mohawk Company was in fact then, as matters stood, insolvent. This, of course, involved Garling to some extent. Of this there can be no reasonable doubt. I cannot find under the evidence that the Bankers' Surety Company had reasonable cause to believe that the giving and enforcement of this mortgage as security for the loan would operate as or effect a preference so far as the creditors of Garling were concerned.

[1] The money borrowed and advanced was furnished to enable the Mohawk Company to go on with its work under these contracts and secure the profits, if any, that would accrue from their full and complete performance, not to pay old or antecedent debts of Garling or of the Mohawk Company. It seems that all believed there was money in the contracts. But when we come to the giving by Garling of the mortgage to the Bankers' Surety Company to secure it for the full, proper, and faithful performance and completion of such con-. tracts by the Mohawk Company, and thus relieve the surety company from its loss in case it should be compelled to pay the obligee or obligees in the bonds given for the faithful performance of the work, and thus secure the bonds given by Garling to the surety company, we have a different proposition. It was security to the Bankers' Surety Company for any loss it might sustain, or any sum it might be compelled to pay, by reason of its having signed the bonds of the Mohawk Company. and indirectly security to it for Garling's bonds. Garling had indemnified the Bankers' Surety Company by his bond and had incurred a liability to it. It is self-evident that the surety company was seeking security and that Garling was induced to give it. The mortgage created a lien on Garling's real estate for the benefit of the surety company, to secure it for its existing liability on its bonds and the existing liability of Garling to the surety company on his bond. It was security for an antecedent liability. It is evident that Garling was actually insolvent on the 2d day of August counting against him his liability on his bond to the surety company. He was then indorser on the notes of the Mohawk Company in the sum of $10,182 in addition to his other obligations and liabilities. The trustee urges that as to the $13,000 bond executed by the Mohawk Company to Warner to secure the performance of the Canal contract work with the Bankers' Surety Company as surety, and as to which Garling became the indemnitor of the Bankers' Surety Company, the same was released and canceled by the obligee Warner October 18, 1910, and that as Warner, to whom and for whose benefit it was given, released the surety on such bond, he also released the indemnitor of the surety company, Garling; that if the Bankers' Surety Company was not liable thereon after October 18, 1910, its indemnitor, Garling, could not be; and that, so far as the Barge Canal work was concerned (Tribes Hill contract), Garling personally had incurred no personal liability or obligation other than by executing such indemnity bond to the surety company; and that therefore the mortgage in no event can be continued or held as a security for any default or resulting damage growing out of the nonperformance of such Barge Canal contract. The mortgage expressly re-

cites the liability of Garling as indemnitor to the surety company on this bond given by the Mohawk Company to Warner. That liability, so far as the Barge contract was concerned, was created and fixed by that indemnity bond. As to that part of the consideration for the mortgage the liability of Garling would end if the Barge Canal work was fully performed, or if the consideration wholly failed, or if the bond executed by the surety company was canceled or ended, for in such case the contract of indemnity would fall with it. Garling indemnified the Bankers' Surety Company for executing the bond and secured it for its liability by reason of executing such bond. If then the Bankers' Surety Company never became liable on the bond and cannot become liable thereon, how can Garling be or become liable on his indemnity bond? But it is said there was a substitute for the bond of $13,000 executed by the Mohawk Company with the Bankers' Surety Company as surety and to which the indemnity bond of Garling applied, and that therefore Garling's liability continues; he having executed the mortgage prior to the release of the bond. Garling was not a party to the agreement of October, 1910, pursuant to which that $13,-000 bond was released and canceled, and did not assent to it. When he executed the mortgage, he was not securing his own personal debts, but the obligations of others.

The agreement of October 18th, between the Bankers' Surety Company and Warner, expressly recites that the Mohawk Company has defaulted in the performance of the contract (Barge Canal contract) and abandoned same. It also expressly recites the bond of $20,000 given by Warner to the American Pipe & Construction Company with the Bankers' Surety Company as surety for the performance of this Barge Canal work, and that Warner is totally unable to perform his contract and desires to be relieved of liability on the bond given to the American Company and of all liability of every kind and nature arising or growing out of the execution by him of either or both of said bonds to the Bankers' Surety Company. Hence Warner, protected by the $13,000 bond, surrenders and cancels it and waives all rights which he secured thereunder and the surety company in consideration of being released on such $13,000 bond releases and discharges Warner from his liability on such $20,000 bond. Here is a new contract and agreement with new obligations and liabilities on the part of the surety company, and I do not see that it can be held to operate to continue the liability of Garling to make good the Bankers' Surety Company in case it as surety for the Mohawk Company was compelled to pay anything by reason of the default of the Mohawk Company to perform the contract. On default by the Mohawk Company, Warner voluntarily surrendered and canceled the bond, and as a consideration agreed with the surety company, waiving all rights which Warner had thereunder by reason of the default of the Mohawk Company, that it would save him harmless on the $20,000 bond, a liability to the American Pipe & Construction Company. As the Matteawan contract paid out in full, the mortgage secures nothing on that, and, if Garling's liability on the $13,000 bond was released, the mortgage can only stand, in any event, as security for the $13,000 money advanced.

When A. gives a bond to B. with surety for the doing of a partic-

ular thing, and C. indemnifies the surety for becoming such, and A. makes default, and thereupon B. releases the surety and cancels the bond, does he thereby release such indemnitor on his bond? It cannot be doubted that such is the effect. It may be that if there is default, and damage results, and the surety pays a fair sum agreed upon, the indemnitor will be liable for that sum. City of New York v. Baird, 176 N. Y. 269, 68 N. E. 364; Bank of Buffalo v. Schwartz et al., 53 App. Div. 517, 65 N. Y. Supp. 981. But the obligation of the indemnitor cannot be transferred without his consent to the performance of some other and different contract not contemplated by it and to which he does not assent. The American Company took the contract and agreed to do the work therein mentioned. It sublet to Warner, who agreed to do the work. Warner with the Bankers' Surety Company as surety gave bond to the American Company to perform the contract. Then Warner sublet to the Mohawk Company, which agreed to do the work, and it gave bond to Warner with the Bankers' Surety Company as surety that it would. Garling in effect agreed that, if the Mohawk Company did not do the work, and Warner paid any damage or suffered any loss, and the surety company had to pay, he would reimburse it. Garling never agreed that if Warner did not do the work, and the American Company paid any damage or suffered any loss, and the surety company was compelled to pay, he would reimburse it. The mortgage recites no such obligation or liability and was not given to secure any such liability. The work to be done may have been the same, but the party who was to do it was entirely different, and the obligations of the two contracts were different.

I therefore hold, so far as the Matteawan contract is concerned, that there is and can be no liability under the mortgage, and, so far as the Barge Canal contract (Tribes Hill) is concerned, that there is not and cannot be any liability under the mortgage. The mortgage was given August 2, 1910, and the bond was surrendered and the surety released October 18, 1910. That mortgage was not a substitute for the bond of the surety company, nor a security in addition to that afforded by that bond, so far as the Barge Canal work is concerned. It was, and was intended to be, security for the obligation and liability of Garling as indemnitor to the surety company. If not so, so far as the Barge Canal work is concerned, it was and is without consideration and, as against the trustee, void. When Warner, the obligee in the bond, released the surety on that bond, he at the same time and thereby released the indemnitor of the surety company. Montgomery v. Sayre, 100 Cal. 182, 34 Pac. 646, 38 Am. St. Rep. 271; O'Mara v. Nugent, 37 N. J. Eq. 326; Dibble v. Richardson, 171 N. Y. 131;[1] Wronkow v. Oakley et al., 133 N. Y. 505, 511, 31 N. E. 521, 16 L. R. A. 209, 28 Am. St. Rep. 661. In Montgomery v. Sayre, supra, it is held that the release of an indorser on a note releases the surety on a collateral note. In O'Mara v. Nugent, supra, it is held that one who pledges property of his own as security for the debt of another is entitled to a retransfer of the property after a release of the debtor by the creditor. In Wronkow v. Oakley, supra, Peckham, J., said:

"Upon the affirmance of the judgment by the latter court, the sureties on the last appeal bond took an assignment of the judgments, and in their hands

[1] 63 N. E. 829.

there was no longer any liability on the part of the sureties on the first appeal. Such sureties (first appeal) became, on the giving of the second undertaking to pay the judgments, sureties for the second sureties, and, when the second sureties paid or discharged their obligation to the owner of such judgments and took an assignment of them, they could not enforce them against the first sureties."

That is, the release of the surety releases the surety of such surety.

[2] Here Warner was secured by the Bankers' Surety Company, which in turn was secured by its surety, Garling, who gave the mortgage (so far as Barge Canal work is concerned) to secure his obligation. When Warner released his surety and that surety accepted the release, the surety of such surety was also released, and, of course, there was no longer any liability on the mortgage as security for the performance of that contract. This brings us back to the consideration of the question of the validity of the mortgage as security for the payment of the $13,000 advanced by the Bankers' Surety Company to carry on and complete the work done under the contracts. True the money was not advanced to Garling for his personal use and benefit in his own personal business, but it was advanced at his request and to carry on work in which he was vitally interested. The Mohawk Company owed him, as he was an indorser on its paper, and he had stock in the company. He had indemnified the surety of that company obligated to make good the performance of the contract where money was to be made or lost by the Mohawk Company by its performance or nonperformance. Garling's estate was involved. His solvency was in peril. It is doubtless true that the Bankers' Surety Company knew all this. Doubtless it knew that there might be nonperformance of the contract and a liability which the Mohawk Company could not meet, and which Garling would be compelled to pay, and which might exhaust the entire estate of Garling and leave him insolvent. These were possibilities. Work was at a standstill. The Mohawk Company was out of funds. Notice had been given that the work must proceed, etc.

Section 60a of the Bankruptcy Act provides:

"A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, * * * made a transfer of any of his property, and the effect of the enforcement of such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

And section 60b provides:

"If a bankrupt shall have * * * made a transfer of any of his property, and if, at the time of the transfer, * * * the bankrupt be insolvent and the judgment and transfer then, operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such * * * transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person." Act July 1, 1898, c. 541, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1911, p. 1506).

If this $13,000 had been advanced for the purpose of reducing a fixed obligation or indebtedness of the Mohawk Company which the surety company was obligated to make good and which Garling as indemnitor was obligated to make good, we would have a case where

the debt or obligation of Garling to the surety company was reduced by the $13,000 advanced, and its obligation to pay the debt of the Mohawk Company was reduced, and where Garling was securing such payment and preferring his creditor the surety company to the detriment of his other creditors. But that is not the case. This was a struggle on the part of Garling to have a contract performed in which his estate was indirectly involved. It was borrowing money for the Mohawk Company to be used by it or for it and the giving of security for such cash advanced and the advance of which benefited or was intended and supposed to increase and benefit Garling's estate. Here was a present cash consideration to the extent of $13,000 for this mortgage. It was not an old debt. The money was put into work in which Garling was financially interested and not to rescue him from present but to save him from possible future insolvency. The obtaining of this money under such circumstances and the giving of this mortgage to secure its repayment was not a fraud on creditors or a preference.

But it is urged that this $13,000 so advanced has been repaid to the Bankers' Surety Company. When this money was advanced, it was to be used in prosecuting the work on the Matteawan contract and the Barge Canal (Tribes Hill) contract. The evidence clearly shows that it was put into work on both contracts. Some $2,500 of it with the consent of Garling was used in the prosecution of another contract being performed by this Mohawk Company. As already stated, there was a flood and a washout on this Barge Canal work and it was abandoned. The money put into it—stated to be something like $75,000—was a dead loss. But the Matteawan contract was completed by and under the direction of P. B. Paul, employed by the Bankers' Surety Company, and all the money put into it came back by way of compensation for the work done.

The power of attorney to Ryan authorized him to collect and receive: (1) The $13,000 from the Bankers' Surety Company. (2) To apply same in and towards the prosecution and carrying on of the paving contract with the village of Matteawan and the work of building and constructing a part of sections 2 and 3 of the Barge Canal. (3) And further to receive for and on behalf of the Mohawk Company all moneys due or to grow due upon either or both of said contracts by reason of any work done upon the said contracts.

Nothing was said as to the disposition to be made of these moneys due or to grow due on such contracts when collected by Ryan. When collected it became the money of the Mohawk Company. Ryan was its attorney in fact and testifies that all the $13,000, and all of the money received by him on the Matteawan contract was used on the Barge Canal contract and the Matteawan contract in payment of the debts of the Mohawk Company. That he mingled the $13,000 and money received from the Matteawan job and paid them out on the jobs. It must be presumed, in the absence of evidence to the contrary, that the agent paid and disbursed the money as he was authorized to do by the Mohawk Company. I do not find that he was ever authorized or directed to pay anything on the $13,000 secured by the mortgage, or that he ever did. I cannot find evidence to sustain the contention that

Ryan was agent for the defendant, so that payments to him of money coming in on the Matteawan contract were payments to the defendant and reduced the mortgage. It is true that at least $10,465.21 was received on the Matteawan contract more than was necessary to complete it, and more than was used to complete it, and this sum was used on the Barge Canal contracts; but it was the Mohawk Company that controlled and so applied this money. Neither can I find evidence to support any finding or conclusion that Paul, who was sent to complete the contracts, received more than $1,598.67 which is applicable to the reduction of the $13,000 secured by the mortgage. The counsel for the plaintiff neither points out nor indicates any figures to this effect. There was no sufficient accounting on the trial to demonstrate any greater sum was received by him. But after completing the Matteawan contract he did have that sum, and it was applicable to the mortgage debt. The defendant by its agent received it.

The assertion is made that as to the $13,000 advanced it was fully paid, but how and when I am not informed, unless it be on the assumption that all money received by Ryan on the Matteawan job and not put into it should have been applied to the mortgage and not used on the Canal job. But Ryan was agent of the Mohawk Company for receiving the money and, so far as appears, for paying it out, and it does not appear that he violated any duty or instructions in carrying on the work on both contracts so long as he did and so long as he had money belonging to the Mohawk Company.

I am therefore forced to the conclusion that this mortgage is a good and valid security for the sum of $13,000 and interest on same from the dates the various sums making it up were advanced, less $1,598.67, and for no other or greater sum or liability. This is an equity action, and it seems to me that with the parties before the court a final judgment or decree can be pronounced as to the rights of the parties under this mortgage. I think the trustee can sell this mortgaged property free and clear of the mortgage lien if he can sell it for more than the sum due thereon, and, if it brings more than the $13,000 and interest less the said $1,598.67, he will pay the defendant the amount found due it and retain the balance. This can be done under the direction of the referee approved by the court. Or on payment to the surety company, the defendant, of the sum of $13,000 and interest less the sum named, the trustee will be entitled to a cancellation and satisfaction of the mortgage.

There will be a decree that the sum now secured by the mortgage is $13,000 and interest as stated, and that it is a good and valid security for that sum less $1,598.67 and no more, and; to that extent and no more, a lien on the real estate described therein; that on payment of such sum of $13,000 and interest thereon less $1,598.67 to the Bankers' Surety Company the trustee will be entitled to a satisfaction or cancellation of such mortgage which the defendant will be directed to execute and deliver. In the meantime the defendant will be enjoined and restrained from foreclosing the mortgage.